2019 IL App (1st) 181116-U

No. 1-18-1116

Order filed December 19, 2019

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF KERRY PARIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Cook County. |
| | ) | |
| and | ) | No. 16 D 4685 |
| | ) | |
| FRANK MARTIN PARIS, JR., | ) | |
| | ) | |
| Respondent-Appellant | ) | Honorable |
| | ) | Karen J. Bowes, |
| (Stein & Stein, Ltd., Appellee). | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justice Reyes concurred in the judgment.
Presiding Justice Gordon specially concurred.

**ORDER**

¶ 1    *Held*: (1) The circuit court's determination that the husband had the ability to pay the $550,000 interim fee was not an abuse of discretion.
(2) The circuit court erred by ordering the husband to pay interim fees and costs allocated to the husband's attorney and expert witness.
(3) The circuit court's finding that the husband willfully and contumaciously disobeyed the interim fee order was not against the manifest weight of the

evidence, and the court's judgment that held the husband in indirect civil contempt was not an abuse of discretion.

¶ 2    In this appeal from pending marriage dissolution proceedings, respondent Frank Martin Paris, Jr., (Martin) challenges the circuit court's order that held him in indirect civil contempt for disobeying an interim fee order and committed him to jail until he paid the $550,000 purge. He also challenges the portion of the circuit court's interim fee order that required him to pay $550,000 into a fund for the parties' lawyers and financial experts.

¶ 3    Specifically, Martin argues that the circuit court erred when it (1) determined that he had the financial ability to pay $550,000 in interim fees, (2) allocated interim fees to Martin's attorney and expert witness that were not authorized by statute, and (3) found that Martin willfully and contumaciously disobeyed the interim fee order.

¶ 4    For the reasons that follow, we affirm the circuit court's orders that held Martin in indirect civil contempt and required him to contribute $550,000 for the interim fees and costs of his wife's counsel and expert witness, and the children's representative. However, we reverse the portion of the interim fee order that allocated interim fees and costs to Martin's attorney and expert witness.[1]

¶ 5                    I. BACKGROUND

¶ 6    In May 2016, petitioner Kerry Paris, through the law firm of Stein and Stein, Ltd. (Stein), filed for dissolution of her marriage to Martin. Kerry and Martin were married for 14 years and had seven children, whose ages ranged from 2 to 12 years old. Kerry's petition for dissolution alleged that she was unemployed and Martin was self-employed. She also alleged that she did

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

not have the ability to pay attorney fees whereas Martin was well able to do so. In Martin's response filed by the law firm of Rosenfeld Hafron Shapiro & Farmer (Rosenfeld), he admitted Kerry's unemployment and his self-employment. The ensuing litigation was acrimonious and involved substantial discovery, motions to produce, subpoenas, protective orders and enforcement actions.

¶ 7     In August 2016, Kerry moved the court for interim attorney fees and costs, requesting $50,000 in attorney fees and $15,000 to pay her expert, Stout Risius Ross (SRR), a business valuation firm. In her affidavit, Kerry attested that she had no income, had paid Stein $5000, and owed them over $11,000.

¶ 8     In response, Martin stated that Kerry received a monthly income of $5634 from one of his companies; he had paid his attorney $7500 and owed over $10,000; and he was involved in numerous real estate ventures but was not able to pay Kerry's fees.

¶ 9     In November 2016, Stein filed a supplemental affidavit, stating that Kerry had incurred fees of $46,903, of which $5000 had been paid. After a fee hearing, the court ordered Martin to pay within 21 days $41,903 to Stein for fees incurred, $15,000 to Stein as prospective fees, and $15,000 to SRR for its prospective fees.

¶ 10     In December 2016, Kerry moved the court to find Martin in indirect civil contempt based on his failure to comply with the court's November 2016 interim fee order. Thereafter, Martin delivered the interim fee checks to the court, which continued the contempt petition until the checks cleared. The court also granted Martin a one-time continuance to answer Kerry's interrogatory that sought information as to what property Martin claimed was non-marital.

¶ 11     In January 2017, Kerry moved for exclusive possession of the marital home, detailing allegations of mental and physical abuse. She also moved for temporary maintenance and support, alleging that Martin was using money as a weapon, she had no resources for necessities for the children and herself, and Martin's 2014 and 2015 tax returns listed his earned income as $3,896,167 and $1,167,522, respectively. Kerry also moved for discovery compliance and sanctions based on Martin's failure to produce numerous documents, including records for 75 accounts, and failure to answer the interrogatory regarding his non-marital property claims.

¶ 12     In response, Martin asserted that Kerry had a sufficient monthly income of $5633.12 but spent money extravagantly. He claimed that Kerry had physically assaulted him and he could not be expected to value the 51 entities in his real estate development business at this point in the litigation.

¶ 13     In March 2017, Rosenfeld moved to withdraw as Martin's counsel, stating that it could not represent him for professional reasons. However, Rosenfeld withdrew that motion one day later when the court found that Martin failed to sufficiently answer the interrogatory about non-marital claims, ordered him to pay Kerry's fees for this failure, gave him a time limit to answer the interrogatory, and directed Stein to prepare a fee statement. In May 2017, the court ordered Martin to pay $5310.62 of the $6310.50 incurred fees listed in Stein's fee statement. Meanwhile, the court had denied Martin's motion to quash subpoenas on six banks and ordered the production of bank records going back to 2001.

¶ 14     In April 2017, Kerry filed another motion for interim attorney fees and costs. She stated that SRR had been paid $15,000 and was owed $15,032, and she expected to incur $40,000 to $50,000 in additional costs in the next four months. Stein estimated that if the case settled, its

future fees would be $150,000. Kerry requested $108,000 in interim and prospective attorney fees and $62,232.50 in interim and prospective expert witness fees.

¶ 15    In response, Martin stated that he had paid his attorneys $40,000 and owed them over $60,000 while he had paid Kerry's attorneys and expert more than $71,000. Martin denied having funds to pay fees and asserted that the money should be taken from the equity in the parties' marital home. To support his inability to pay claim, Martin submitted an unsworn letter from his expert witness, Jeffrey Brend, who had examined Martin's finances.

¶ 16    Meanwhile, Stein submitted a supplemental affidavit in support of the pending fee petition, stating the firm had been paid $61,903 and was owed $88,878.56, and SRR had been paid $15,000 and was owed $28,876.25. Kerry also moved for a protective order and sanctions based on subpoenas Martin had served to obtain her texts, internet browser history, and information from the children's baseball league and school. The court ultimately denied the subpoena to the school and entered a protective order requiring the internet provider and browser to submit any records to the court for the judge's *in camera* inspection only.

¶ 17    In July 2017, Howard Rosenberg, the court-appointed representative for the children, filed for fees against Martin, stating that Rosenberg had been paid a $5000 retainer and was owed $16,307.53, and that the case had been "extremely contentious" and "very difficult" with the parties raising "serious allegations" against each other. In August, Stein filed a supplemental affidavit, stating that it was owed over $133,000 from total billing that exceeded $180,000.

¶ 18    On August 8, 2017, the court held a non-evidentiary hearing but both attorneys brought a financial expert to inform the court. The court agreed to hear the experts even though they did not give sworn testimony. Kerry's counsel argued that Martin's 2016 financial statement and

2015 income tax return showed that he had $7.7 million in marketable securities and he had reported a net income in excess of $1 million in 2016. Kerry's expert from SRR stated that he could not verify Martin's claimed restrictions on his assets because he failed to comply with discovery. Nevertheless, the available records showed that (1) Martin's lines of credit had been continually extended and increased, (2) he had at least $826,000 in additional borrowing capacity, (3) millions of dollars were built into contingencies in project budgets, (4) he was worth over $20 million, and (5) his stocks alone had gone up in value by $300,000 since early 2016. SRR's expert fees were approaching $100,000, and Kerry's attorney opined that SRR would need at least $200,000 in this litigation.

¶ 19    Martin's counsel argued that all of Martin's assets were encumbered, his loans required him to maintain millions of dollars in liquid assets, and he had ongoing real estate projects with more debt than equity. Brend, Martin's expert, stated that (1) Martin's cash was "tied up with outside investors" or needed as operating capital because the businesses did not have enough money to operate beyond one month, (2) one line of credit was restricted for real estate use only, and (3) the real estate projects had liquidity restrictions and the banks could call in their loans if the stock market dropped by 10%. Brend had been paid $10,000 and was owed $29,000. Martin's attorney was seeking another $50,000 in prospective fees for Brend.

¶ 20    The court ruled that the interim fees and costs would be allocated from a fund of $750,000, and $200,000 of this sum would come from the equity in the marital residence. Martin would contribute by September 8, 2017, the remaining $550,000, which would be held in his attorney's client fund account. The court allocated $200,000 to each party's attorney; $150,000

to Kerry's expert SRR; $90,000 to Martin's expert Brend; and $25,000 to the children's representative. A balance of $85,000 would be left in the account.

¶ 21   In September 2017, Kerry filed a petition for indirect civil contempt based on Martin's failure to pay the $550,000 as ordered. Instead, Martin had presented Kerry with a copy of his September 6, 2017 loan application, which listed the borrower as a subchapter S corporation that was 91% owned by a revocable living trust of Martin. Although Kerry was not listed as an owner of the corporation, the application indicated that she would be contractually responsible for the loan. Kerry refused to sign the loan application and argued that Martin was acting in bad faith by attempting to make Kerry responsible for the $550,000 the court had ordered Martin to pay.

¶ 22   At a hearing in December 2017 on Kerry's motion for temporary support, Martin's attorney asserted that Martin had suffered serious financial reversals since October but would be clear of his financial problems in six months. The court noted there was no evidence of a financial calamity but limited the parties' Christmas spending to presents for the children, warning that Martin would be sanctioned heavily if his contentions were not true. The court also provided that if a rule to show cause against Martin on Kerry's contempt petition was issued at the next court date, the matter would not be continued and the burden would immediately shift to Martin to prove why he should not be held in contempt.

¶ 23   In his January 2018 response to Kerry's contempt petition, Martin asserted that he could not obtain a $550,000 loan without Kerry's signature, denied acting in bad faith, and claimed he lacked the personal funds or any ability to take funds from his businesses to satisfy the interim fee order. Martin also filed a petition for a rule to show cause against Kerry, stating that she failed to cooperate with the bank regarding the parties' application for a $200,000 home equity

line of credit. Kerry responded that it would be inequitable to proceed on the loan against their marital home while Martin failed to produce the $550,000, for which he was solely responsible.

¶ 24     At the February 28, 2018 hearing on Kerry's contempt petition, the court granted Kerry's motion *in limine* to preclude Martin's use of thousands of documents he had sent to Stein the night before and the morning of the hearing. Rosenberg, the children's representative, stated that he was owed $50,000 in fees. Stein's supplemental affidavit stated the firm had incurred fees of $334,011.23, been paid $67,213.62, and was owed $266,797.61. SRR had incurred $125,895.84 in expert fees, been paid $15,000, and was owed $110,895.84.

¶ 25     Martin testified that the only bank from which he had applied for a $550,000 loan wanted the loan guaranteed by Martin, his revocable trust and Kerry. Martin claimed that his only current income was a $20,000 a month distribution and only liquid asset was a checking account containing about $2000. His stock accounts totaling about $7 million were pledged as collateral and he needed money to meet his portion of cost overruns that he shared with partners and that might be incurred in ongoing projects. He was currently involved in about four projects that were ending and two that were starting. One of the new projects had loan financing and a $3 million contribution from a capital partner; the loan was due in April and Martin was a guarantor, and the entity did not have the funds to make the April payment. Martin asserted that if he accessed money from any of his business entities, he would be violating agreements with banks and partners and would trigger either the dissolution or reorganization of his entire business.

¶ 26     On cross-examination, Martin was shown financial statements he had submitted to entities to obtain loans in 2015, 2016 and 2017, which listed his net worth at about $20 to $22 million. These statements estimated that his income for those years would be $2 million, $1.74

million, and $1.58 million, respectively. Moreover, his estimated liabilities or expenditures for those years were $789,000, $753,000, and $610,000, respectively. He was also shown 2015, 2017 and 2018 account statements from entities held by a holding company he had organized. In January 2018, the value of the account was $6,349,010. Martin also had another bank account that contained about $1 million. Martin was also shown financial documents that showed him securing loans on business projects, drawing down money on those loans and using some of the funds for personal expenses, and transferring funds from his business accounts to his personal account. In December 2017, when Martin claimed to be struggling financially, he issued a $90,000 check to an employee as an advance against commissions. Martin also paid about $3000 to an attorney he hired to file an ARDC complaint against Kerry's boyfriend.

¶ 27    The executive at the bank from which Martin attempted to borrow $550,000 testified that he had known Martin since 1997 and knew that the loan was for Martin's divorce case. Martin, however, never told the executive that the court had prohibited Martin from obtaining a loan that required Kerry to sign as a guarantor.

¶ 28    The court found Martin in indirect civil contempt and set the purge at $550,000, which had to be paid by April 13, 2018. The court reiterated that Kerry would not have to sign as a loan guarantor except for the $200,000 home equity loan. The court also found Kerry in indirect civil contempt for failing to initial the page requested by the home equity lender. In addition, the court entered a contempt order against Martin for failing to pay support.

¶ 29    On May 21, 2018, Martin had not secured the $550,000 loan, and the court entered an order of commitment and remanded him to jail with a purge amount of $550,000. On May 24,

2018, Martin filed a notice of appeal and a motion for a stay pending appeal, which was granted the next day. Shortly thereafter Martin posted the required $650,000 appellate bond.

¶ 30                                    II. ANALYSIS

¶ 31     On appeal, Martin argues that the trial court erred by (1) ordering him to pay $550,000 in interim and prospective attorney fees and costs, (2) allocating interim fees to Martin's attorney and expert where Martin was not the petitioning party, and (3) holding Martin in indirect civil contempt for willfully and contumaciously disobeying the interim fee order.

¶ 32     The Illinois Marriage and Dissolution of Marriage Act (Act), allows the court to assess interim attorney fees and costs against the opposing party when the court finds that the petitioning party needs the award to participate adequately in the litigation. See 750 ILCS 5/501(c-1) (West 2016). "Except for good cause shown, a proceeding for (or relating to) interim attorney's fees and costs in a pre-judgment dissolution proceeding shall be nonevidentiary and summary in nature." 750 ILCS 5/501(c-1)(1) (West 2016). When an interim fee petition is supported by affidavit(s), the court shall afford the opposing party an opportunity to file a responsive pleading. *Id*. The Act sets forth several factors the court should consider when assessing whether to grant an interim fee award. See *id.* If an interim award is granted under section 501 of the Act, it is "without prejudice to any final allocation and without prejudice as to any claim or right of either party or any counsel of record at the time of the award." 750 ILCS 5/501(c-1)(2) (West 2016). "Any portion of any interim award constituting an overpayment shall be remitted back to the appropriate party or parties, or, alternatively, to successor counsel, as the court determines and directs." *Id.*

¶ 33   "[A] court order awarding interim attorney fees under section 501(c–1) of the Act is not an appealable interlocutory order." *In re Marriage of Radzik*, 2011 IL App (2d) 100374, ¶ 45. "However, when a party appeals from a contempt sanction imposed for violating an interim fee order, the contempt finding is final and appealable and presents to the reviewing court the propriety of the underlying order." *Id*. Martin timely appealed from the court's contempt sanction imposed for his failure to comply with the order assessing the $550,000 interim attorney fees and costs. Therefore, we review the propriety of the underlying order assessing the fees and costs. See *In re Marriage of Patel*, 2013 IL App (1st) 122882, ¶¶ 33-38.

¶ 34                     A. Martin's Ability to Pay Fees and Costs

¶ 35   First, Martin argues that the trial court erred as a matter of law in its August 8, 2017 order that required him to pay $550,000 in attorney fees and costs because the trial court failed to make a specific finding, either orally during the hearing or in its written order, that Martin had the ability to obtain that amount from any source.

¶ 36   "The construction of a statute is an issue of law subject to *de novo* review." *People ex rel. Department of Professional Regulation v. Manos*, 202 Ill. 2d 563, 567 (2002). When the court declares and enforces the law as enacted by the legislature, or interprets the language used by the legislature where it requires interpretation, the court does not add new provisions, substitute different provisions, or depart from the plain meaning of a statute by reading into it exceptions, limitations, or conditions. *Id*. at 568-69. The primary rule of statutory construction is to ascertain and effectuate the legislature's intent. *In re Marriage of Logston*, 103 Ill. 2d 266, 277 (1984). In doing so, a court looks first to the statutory language itself; if the language is clear, the court must give it effect and should not look to extrinsic aids for construction. *Id*. The statute should be

evaluated as a whole, with each provision construed in connection with every other section. *Abrahamson v. Illinois Department of Professional Regulation,* 153 Ill. 2d 76, 91 (1992).

¶ 37    Section 501(c-1)(3) of the Act provides, in pertinent part:

"*the court \*\*\* shall assess an interim award against the opposing party* in an amount necessary to enable the petitioning party to participate adequately in the litigation, *upon findings that the party* from whom attorney's fees and costs are sought *has the financial ability to pay* reasonable amounts and that the party seeking attorney's fees and costs lacks sufficient access to assets or income to pay reasonable amounts." (Emphasis added.) 750 ILCS 5/501(c-1)(3) (West 2016).

¶ 38    The plain language of section 501(c-1)(3) does not require the court to expressly set forth specific findings in an order allocating interim fees and costs; it simply states that one action of the court—assessing an interim fee award—is triggered by the other—finding that the opposing party has the ability to pay reasonable attorney fees and costs and the petitioner does not. The trial court's findings regarding the parties' ability to pay reasonable fees are inherent in the court's order assessing those fees. See also 501(c-1)(2) (West 2016) ("An order for the award of interim attorney's fees shall be a standardized form order and labeled 'Interim Fee Award Order.' ").

¶ 39    If the legislature had intended to require the trial court to make an express factual finding of a party's ability to pay an interim fee award pursuant to section 501(c-1)(3), then the legislature would have enacted a provision similar to section 504(b-2)(1) of the Act, which provides that in cases "involving the issue of maintenance, *the court shall make specific findings of fact*" and "*shall state its reasoning* for awarding or not awarding maintenance and shall

include references to each relevant factor set forth in subsection (a) of this Section." (Emphasis added.) 750 ILCS 5/504(b-2)(1) (West 2016). The legislature easily could have required specific findings of fact and stated reasons for section 501(c-1)(3) interim fee awards, but it did not do so. An elementary rule of construction is that when the legislature uses certain words in one instance and different words in another, it intends a different meaning. *Aurora Pizza Hut, Inc. v. Hayter*, 79 Ill. App. 3d 1102, 1105-06 (1979).

¶ 40    Furthermore, the record on appeal adequately allows this court to review the propriety of the court's interim fee award. See *Blum v. Koster*, 235 Ill. 2d 21, 37-38 (2009) (where the record adequately provides a basis that allows the court to review the propriety of a spousal maintenance order under section 504 of the Act and the order is supported by the evidence, the order will not be reversed solely because specific findings of fact were not made).

¶ 41    In *In re Marriage of Nash*, 2012 IL App (1st) 113724, ¶ 18, this court reversed an interim fee order that required an attorney to disgorge funds from his retainer based on the trial court's failure to make a finding that both parties lacked the financial ability, assets or income to pay reasonable attorney fees. *Nash*, however, is distinguishable from the instant case. In *Nash*, the trial court's written order contained potentially contradictory statements that could have been read to mean the respondent both did and did not have the ability to pay reasonable fees. *Id.* ¶¶ 22-23. No such ambiguity exists in the trial court's order in the instant case.

¶ 42    Accordingly, we reject Martin's assertion that the court's interim fee award is reversible as a matter of law.

¶ 43    Second, Martin argues that the evidence does not support a finding that he had the ability to pay the $550,000 interim fee order. According to Martin, "the uncontroverted evidence"

showed that (1) he could not garner the ordered fee amount without Kerry's cooperation because he lacked sufficient liquid assets, (2) he could not default on his "outside personal liabilities that were in the tens of millions of dollars," (3) his liquid business assets were collateralized or otherwise pledged and were necessary for compliance with bank covenants, (4) he would default under his contracts if he withdrew business funds, and (5) his existing lines of credit were maxed and unable to be utilized.

¶ 44 We review the court's award of interim attorney fees for an abuse of discretion. *In re Marriage of Levinson*, 2013 IL App (1st) 121696, ¶ 34. We will not reverse the court's award unless the court " 'acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted' " and no reasonable person would take the view adopted by the court. *Id*. (quoting *In re Marriage of Aud*, 142 Ill. App. 3d 320, 326 (1986)).

¶ 45 The relevant factors the court must consider in assessing an interim award include (1) the income and property of each party, (2) their needs and realistic earning capacity, (3) the standard of living established during the marriage, (4) the degree of complexity of the issues as well as reasonable needs for expert investigations or witnesses, (5) each party's access to relevant information, (6) the amount of payments made or reasonably expected to be made to the petitioning party's attorney, and (7) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/501(c-1)(1) (West 2016). Although the petitioning party seeking interim fees has the burden of showing the opposing party's ability to pay, the opposing party may forfeit his claim of inability to pay attorney fees if he refuses to present evidence of his own financial circumstances. *In re Marriage of Walters*, 238 Ill. App. 3d 1086, 1101 (1992); *In re*

*Marriage of Cierny*, 187 Ill. App. 3d 334, 348 (1989) (citing *Kazubowski v. Kazubowski*, 45 Ill. 2d 405, 416-18 (1970)).

¶ 46    According to the record, at the February 2018 hearing on Kerry's contempt petition, the court granted her motion *in limine* to preclude Martin's use of the thousands of documents he dumped on Kerry's attorney the night before and the morning of that hearing. Martin's failure to timely disclose his financial circumstances aside, the trial judge, who was familiar with the case, was in a better position than this court to assess the past discovery hurdles and delays and consider Kerry's and Martin's access to information. Moreover, the court had warned Martin in December 2017 that he would be sanctioned heavily if his claims about suffering serious financial reversals were untrue.

¶ 47    At the August 2017 non-evidentiary hearing on Kerry's interim fee petition, her supporting evidence included Martin's sworn financial affidavits, financial statements and income tax returns, which showed that he had $7.7 million in marketable securities in 2016 and reported a net income in excess of $1 million in 2016. Although Martin claimed that his assets were pledged to banks that would object to his use of those assets, he failed to support that claim beyond presenting his expert's conjectures concerning possible outcomes if the stock market suffered a precipitous decline. In contrast, Kerry's expert pointed directly to evidence showing Martin's $826,000 in borrowing power, $300,000 increase in his equity holdings, and net worth in excess of $20 million.

¶ 48    Furthermore, Martin's rejected September 6, 2017 application for a $550,000 loan hardly indicates any inability on his part to pay the interim fee order. Despite Martin's September 8, 2017 deadline to contribute the $550,000 interim fee, that September 6, 2017 application was the

only relevant evidence of any attempt by Martin to obtain those funds. Moreover, the loan executive's basis for rejecting that application was Kerry's refusal to sign the application, but Martin had failed to inform the loan executive, who was a longtime acquaintance of Martin, that the court had precluded a loan that required Kerry's signature as a guarantor. Finally, Martin's claimed inability to pay the interim fee was contradicted by his ability to quickly garner the necessary funds after he was incarcerated for a few days as a result of his defiance of the interim fee order.

¶ 49   Based on our review of the record, we cannot say that the trial court abused its discretion by granting the interim award.

¶ 50                          B. Interim Fees and the Non-Petitioning Party

¶ 51   Martin argues that the trial court erred by allocating interim fees and costs to his attorney, Rosenfeld, and expert witness, Brend, because Martin was the opposing party to Kerry's fee petition and section 501(c-1) of the Act limits interim fee awards to petitioning parties. Kerry agrees that the trial court's allocation of interim fees to Rosenfeld and costs to Brend was not authorized under the Act. Martin's contention raises an issue of statutory construction, which we review *de novo*. *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997).

¶ 52   The Act provides, in relevant part:

"(a) The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees. Interim attorney's fees and costs may be awarded from the opposing party, in a pre-judgment dissolution proceeding in accordance with subsection (c-1) of

Section 501 and in any other proceeding under this subsection." 750 ILCS 5/508(a) (West 2016).

¶ 53 However, an attorney cannot file a petition for setting final fees and costs against the attorney's own client unless that attorney has been granted leave to withdraw as counsel of record or has filed a motion for leave to withdraw as counsel. 750 ILCS 5/508(a), (c)(1) (West 2016). At the August 8, 2017 interim fee hearing, Rosenfeld had not been granted leave to withdraw as Martin's counsel and had previously withdrawn its March 2017 motion to withdraw as Martin's counsel.

¶ 54 Furthermore, when the court awards contribution to attorney fees and costs from the opposing party, the court must do so in accordance with section 503(j) of the Act. 750 ILCS 5/508(a) (West 2016). Section 503(j) refers to an award of contribution "*to one party from the other party*." (Emphasis added.) (750 ILCS 5/503(j)(2) (West 2016)). "Thus, the language of 503(j)(2) makes clear only two parties, the spouses, are involved when [the court makes] an award of attorney fees." *Pal v. Gudgel*, 397 Ill. App. 3d 903, 911 (2010). Section 503(j)(2) also instructs the trial court to award attorney fees based on the criteria for the division of marital property or the award of maintenance. 750 ILCS 5/503(j)(2) (West 2016). That criteria, which includes factors like the duration of the marriage and the value of the property assigned to each spouse, is not applicable to someone who was not a spouse in the martial relationship. *Pal*, 397 Ill. App. 3d at 911 (an intervenor, who is not a party to the dissolution, was not eligible for attorney fees under sections 508(a) of the Act).

¶ 55 In addition, the Act defines interim attorney fees and costs, in pertinent part, as those "in favor of the *petitioning* party's current counsel." (Emphasis added.) 750 ILCS 5/501(c-1) (West

2016). Also, the court cannot assess interim fees and costs until "*a party files a petition* for interim attorney's fees and costs *supported by one or more affidavits* that delineate relevant factors *** [and after the court affords] the opposing party a reasonable opportunity to file a responsive pleading." (Emphasis added.) 750 ILCS 5/501(c-1)(1) (West 2016).

¶ 56    Based on the plain language and clear provisions of the Act, we conclude that the trial court erred when it allocated interim attorney fees to Rosenfeld and costs to Brend. Rosenfeld was Martin's counsel of record when the court, on August 8, 2017, allocated $200,000 in fees to Rosenfeld and $90,000 in costs to Brend. Moreover, Martin's counsel's verbal statements in court about the money Martin owed to Rosenfeld and Brend could not satisfy the express requirements of section 501(c-1)(1) that a party must file a petition supported by at least one affidavit, and of section 508(a) for due notice and hearing.

¶ 57    Although we reverse the portion of the court's August 8, 2017 interim fee order that allocated attorney fees to Rosenfeld and costs to Brend, we reject Martin's assertion that the interim fee order should be vacated because Stein is no longer Kerry's counsel of record in the dissolution proceeding. Martin fails to cite any relevant authority to support this proposition and thus has forfeited review of this claim. *Gakuba v. Kurtz*, 2015 Il App (2d) 140252, ¶ 19. Martin's forfeiture aside, section 501(c-1) defines interim attorney's fees and costs as "attorney's fees and costs assessed from time to time while a case is pending, in favor of the petitioning party's *current counsel*." (Emphasis added.) 750 ILCS 5/501(c-1) (West 2016). Stein was Kerry's current counsel when she filed her petition and the trial court allocated attorney fees and costs in the August 8, 2017 order. The issue of Kerry's standing to pursue a claim for the interim fees and costs she incurred through Stein is determined as of when her claim was brought. See *Bank of*

*New York Mellon v. Rogers*, 2016 IL App (2d) 150712, ¶ 30. Accordingly, Stein's subsequent withdrawal as Kerry's counsel does not affect the validity of the court's allocation of fees to Stein.

¶ 58     Although we reverse the allocation of interim attorney fees to Rosenfeld and costs to Brend, we affirm in all other respects the order that required Martin to contribute $550,000 toward the interim fees and costs of Kerry's counsel Stein, Kerry's expert SRR, and the children's representative Rosenberg. At the time of the trial court's challenged August 8, 2017 interim fee order, the costs and fees allocated to Stein, SRR and Rosenberg totaled $375,000, plus a court-ordered remainder of $85,000. Kerry states, and Martin does not contest, that Stein, SRR and Rosenberg incurred additional fees and costs since August 8, 2017. The trial court is in the best position to determine whether any funds remaining from the bond Martin posted should be either held in escrow while further petitions are adjudicated or otherwise allocated or refunded.

¶ 59                              C. Indirect Civil Contempt

¶ 60     Martin argues the trial court erred when it held him in indirect civil contempt. Specifically, he argues that he met his burden to show that he did not willfully and contumaciously disobey the interim fee order because he established that he (1) did not have the financial ability to pay the assessed interim fees, (2) demonstrated good-faith by repeatedly attempting to secure outside lending but Kerry thwarted those attempts by refusing to cosign any loan, and (3) could not raise the funds by liquidating assets, which allegedly would have violated the terms of his commercial and business agreements.

¶ 61    The applicable law is clear:

"The existence of an order of the court and proof of willful disobedience of that order are essential to any finding of indirect contempt. *People v. Wilcox,* 5 Ill. 2d 222, 228 (1955). The burden rests upon the alleged contemnor to show that noncompliance was not willful and contumacious and that he or she has a valid excuse for failure to follow the court order. *People v. Stanley,* 60 Ill. App. 3d 909, 911 (1978). Whether a party is guilty of contempt is a question of fact for the trial court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *In re Marriage of Logston,* 103 Ill. 2d at 286-87." *In re Marriage of Spent*, 342 Ill. App. 3d 643, 653-54 (2003).

¶ 62    Martin's failure to pay interim attorney fees as ordered was *prima facie* evidence of contempt. *In re Marriage of Petersen,* 319 Ill. App. 3d 325, 332 (2001). Once that *prima facie* case was shown, Martin had the burden "to prove that the failure to make *** payments was not willful or contumacious and that there exists a valid excuse for his failure to pay." *In re Marriage of Barile,* 385 Ill. App. 3d 752, 759 (2008). The financial inability to comply with a court order "must be shown by definite and explicit evidence." *In re Marriage of Petersen,* 319 Ill. App. 3d at 333.

¶ 63    As discussed in detail above, the record supports the trial court's finding that Martin failed to show he lacked the financial ability or access to assets or income to pay reasonable attorney fees and costs. Moreover, our decision reversing the allocation of interim attorney fees and costs to Martin's counsel and expert, which totaled $290,000, does not affect the validity of

the trial court's contempt finding because the record establishes that Martin failed to timely raise even the $375,000 portion of the interim fee order allocated to Kerry's counsel and expert and the children's representative.

¶ 64   "[E]xposing one's self to a finding of contempt is an appropriate method of testing the validity of a court order," and a refusal to comply with the court's order may constitute a good-faith effort to secure an interpretation of an issue without direct precedent. *In re Marriage of Beyer,* 324 Ill. App. 3d 305, 321-22 (2001). However, the "Act does not allow for parties to generally test the validity of interim fee awards under the guise of a 'friendly contempt' merely because the party does not agree with the award." *In re Marriage of Levinson,* 2013 IL App (1st) 121696, ¶ 56. The record shows that Martin had no more compelling justification for failing to garner the ordered interim fee beyond his disinclination to pay it. See *In re Marriage of Patel*, 2013 IL App (1st) 122882, ¶¶ 56-59.

¶ 65   The manifest weight of the evidence supports the trial court's finding that Martin's conduct was willful, contumacious, and knowing. Accordingly, we conclude that the trial court did not abuse its discretion when it held Martin in contempt for failing to comply with the interim fee order.

¶ 66                              III. CONCLUSION

¶ 67   For the foregoing reasons, we affirm the circuit court's interim fee order that required Martin to contribute $550,000 for interim fees and costs for Kerry's counsel, Kerry's expert and the children's representative, but we reverse the portion of that order that allocated attorney fees for Martin's counsel, Rosenfeld, and costs for his expert witness, Brend. We also affirm the

judgment of the circuit court that held Martin in indirect civil contempt for disobeying the interim fee order.

¶ 68   Affirmed in part and reversed in part.

¶ 69   Cause remanded.

¶ 70   PRESIDING JUSTICE GORDON, specially concurring:

¶ 71   I agree with the majority's decision in this case, but I must write separately on the issue of reversing the trial court award of attorney fees and costs to the Rosenfeld firm and the fees and costs for their expert witness. I agree it was error for the court to grant the fees and costs without the filing of a petition for fees and costs; however, the Rosenfeld firm can still prepare a petition for fees and costs and present it to the trial court to comply with existing Illinois law, and the trial court will then rule on the petition.