2020 IL App (2d) 191013-U
No. 2-19-1013
Order filed December 7, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| SHEILA McCLURE, | ) | of Du Page County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 04-D-1455 |
| | ) | |
| MICHAEL J. McCLURE, | ) | Honorable |
| | ) | Susan L. Alvarado |
| Respondent-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hudson and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court acted within its discretion in sanctioning respondent $15,000 under section 501 of the Dissolution Act and in ruling that respondent needlessly increased the costs of litigation under section 508(b) of the Dissolution Act. However, the trial court abused its discretion in arbitrarily awarding petitioner $50,000 in attorney fees under section 508(b) without specifying how those fees were linked to respondent's behavior. Therefore, we reverse the $50,000 award and remand for the trial court to make the requisite findings and award petitioner the corresponding amount of attorney fees.

¶ 2    Respondent, Michael J. McClure, appeals from the trial court's orders requiring him to pay petitioner, Sheila McClure, $50,000 in attorney fees under section 508(b) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) and $15,000 under section 501 of the

Dissolution Act. We affirm in part, reverse in part, and remand the cause.

¶ 3                                    I. BACKGROUND

¶ 4      The parties were married on June 24, 1989, and had four children: John, born in 1992; Martin, born in 1994; Mary, born in 1996, and Colin, born in 1997. The parties' marriage was dissolved on October 12, 2005, and the dissolution judgment incorporated their marital settlement agreement.

¶ 5      On August 6, 2012, the parties entered an agreed order regarding the children's college expenses. Each child was to be responsible for one-third of their expenses, respondent was responsible for two-thirds of the remaining amount, and petitioner was responsible for one-third of the remaining amount.

¶ 6      On December 15, 2014, the parties entered an agreed order modifying the provisions regarding college expenses. For the 2014 to 2015 school year, respondent was to pay 79.4% and petitioner would pay 20.6% of the parent cost. For future school years, the parental portion would be divided as a *pro rata* percentage of the parties' Medicare wages from the prior year.

¶ 7      On February 22, 2016, respondent filed a *pro se*[1] petition seeking to reduce his child support obligation. He alleged that there had been a substantial change in circumstances in that: the 2014 child support order was based on his annual salary of $650,000; his employer filed a bankruptcy petition in October 2014; on January 1, 2016, the employer reduced his salary to $25,000 per month; and he lost health insurance benefits. Respondent also alleged that he had remarried and had two additional children who were six and eight years old. Respondent filed an amended petition on March 31, 2016, additionally alleging that he received his last paycheck on

---

[1] Respondent continued to represent himself *pro se* until October 18, 2019.

March 4, 2016, representing work through February 26, 2016. Petitioner's motion to strike respondent's amended petition was granted, and respondent was given leave to file a new amended petition, which he did on June 20, 2016. He additionally alleged that after his employment ended due to his employer's bankruptcy, he did not have any significant sources of cash flow or liquid assets. He alleged that he had been trying to obtain new employment.

¶ 8    Petitioner filed a response on July 11, 2016. She alleged that in spite of respondent's claimed financial hardships, he continued to live a lavish lifestyle, including several overseas trips, membership in a country club, and a stay-at-home spouse.

¶ 9    On December 6, 2016, petitioner filed a motion to modify the parties' college contributions. She alleged that respondent's ability to contribute to college expenses had not changed despite his loss of employment, and that relying on the parties' Medicare wages would create an inequitable division of the expenses. She also alleged that respondent may have started his own business.

¶ 10    On December 8, 2016, the trial court granted in part respondent's petition to modify child support, resulting in a determination that respondent overpaid child support by $5,142.71.

¶ 11    On January 5, 2017, petitioner issued a subpoena for respondent's JP Morgan Chase bank records. Respondent then filed a motion to quash the subpoena, arguing that the request was overly broad and sought checking account activity for an account held by both respondent and his wife. The trial court denied the motion to quash on February 6, 2017.

¶ 12    Respondent filed an answer to petitioner's motion to modify college contributions on March 21, 2017. He denied that he was self-employed, and he alleged that he used points/miles from prior business travel to pay for airfare and lodging for recent trips. He further argued that petitioner's net worth was more than four times his net worth and that she was in a vastly superior

financial position due to years of receiving child support that she used to enrich herself. Respondent stated that his 2016 expenses related to health insurance and the children's support and educational expenses totaled $117,521, which was more than his gross income for that year.

¶ 13    Respondent filed a motion to modify contribution to college expenses on August 2, 2017. He argued that prior to 2016, his expenses for medical and dental insurance were deducted from his Medicare wages, whereas with the loss of his employer-sponsored insurance, such expenses would no longer be subtracted for him but would continue to be subtracted for petitioner. Respondent alleged that he had $28,560 of such expenses in 2016 and was currently paying monthly premiums of $2,362. On September 20, 2017, respondent filed a motion for sanctions for petitioner's alleged failure to comply with discovery.

¶ 14    On October 19, 2017, petitioner filed an emergency motion to continue the hearing on the parties' cross-motions to modify college contributions. She alleged that her counsel had a trial that had been continued to the same date as the hearing set for the instant case. She further alleged that respondent's deposition was taken on October 6, 2017, at which he revealed for the first time that he had started a new business entity and had submitted detailed financial information about the business in order to obtain a business loan. Respondent at first agreed to provide this information to petitioner by October 16, 2017, but after that date declared that he would not do so. It appeared to be an attempt to "sandbag" petitioner in that she would have otherwise subpoenaed the documents from the financial institution in time for the hearing.

¶ 15    The trial court continued the hearing date and ordered respondent to respond to the discovery issues. Petitioner thereafter issued a subpoena for Signature Bancorporation, Inc., and respondent moved to quash the subpoena on November 10, 2017. Respondent argued that the request included all communication between the bank and respondent in his role as president and

CEO of nonparty SeaHarbor Insurance Agency, LLC (SeaHarbor). He argued that this information was "entirely unrelated and irrelevant to the instant proceedings."

¶ 16    On December 11, 2017, the trial court denied respondent's motion to quash as to five paragraphs of the request but granted it as to two paragraphs of the request. On February 5, 2018, the trial court granted in part and denied in part petitioner's motion to compel.

¶ 17    On July 30, 2018, respondent filed a motion to compel the production of documents. On August 1, 2018, he sent a subpoena for documents to petitioner's new husband, Craig Workman, from January 1, 2014, to date.

¶ 18    On August 6, 2018, the trial court ordered the parties to exchange updated financial affidavits and update their discovery, including SeaHarbor's operating and premium accounts for June and July 2018 and items requested by respondent.

¶ 19    Petitioner filed a motion to quash the subpoena for Workman on August 21, 2018, arguing that it was so broad that its only purpose was to harass her and Workman. On September 24, 2018, the trial court granted the motion to quash.

¶ 20    On October 23, 2018, respondent issued a new subpoena on Workman, requesting documents from January 1, 2016, to date. Petitioner filed a second motion to quash the subpoena on October 30, 2018, again arguing that the requests were so broad that respondent's only purpose was harassment. On November 13, 2018, respondent filed a motion to quash petitioner's subpoena on various entities, including JP Morgan Chase Bank and Signature Bank. On January 11, 2019, the trial court granted petitioner's motion to quash and denied respondent's motion to quash.

¶ 21    On April 9, 2019, petitioner filed a motion to compel respondent to comply with discovery, arguing that he had not complied with a supplemental notice to produce.

¶ 22 The following day, petitioner filed a petition for contribution to attorney costs and for section 508(b) attorney fees and costs. She alleged that she had incurred significant expenses to defend against deficient, frivolous, and harassing motions by respondent, including costs associated with the following pleadings: (1) her March 31, 2016, motion to strike and dismiss respondent's amended petition to modify child support; (2) her petition for adjudication of indirect civil contempt filed on July 13, 2016; (3) her October 19, 2017, emergency motion to continue the hearing on the parties' college contributions; (4) her March 19, 2018, petition for indirect civil contempt against Signature Bank; (5 & 6) her August 21 and September 30, 2018, motions to quash the subpoenas issued against Workman; (7) her emergency motion for temporary relief for college contributions filed on November 2, 2018; and (8) her April 10, 2019, motion to compel discovery. She further argued that due to respondent's noncompliance with discovery, trial dates in the matter had been rescheduled six times.

¶ 23 On April 11, 2019, the trial court addressed petitioner's motion to compel and ordered respondent to produce various documents. Petitioner was required to produce some credit card statements to the extent not previously produced. Both parties also voluntarily agreed to produce certain documents.

¶ 24 Hearings took place on the cross-motions to modify the parties' college contributions on May 23, June 7, and July 5, 2019. The parties agreed that any financial evidence presented could be used for the hearing on attorney fees. We summarize respondent's testimony. He earned over $1 million in 2014 from his employment with Affirmative Insurance Holdings, Inc. In 2015, he earned about $650,000. He was automatically terminated from his employment in March 2016 when the company went into chapter 7 bankruptcy.

¶ 25    Respondent began thinking about the concept of his own company, SeaHarbor, in 2015. He began formulating a business plan in late 2016 and applied for a loan from Signature Bank in March 2017. The bank approved the loan in September 2017, and SeaHarbor sold its first policy in November 2017. Bank statements admitted into evidence showed that SeaHarbor had deposits and withdrawals from its account in September 2017.

¶ 26    Respondent predicted that the company would have $5.4 million of gross income in its first 12 months of operation; $12.6 million in its second year, with profits of $587,651; and about $20.4 million in its third year, with profits of $3,047,387. Respondent projected that it would take about 15 months to pay off the loan, but it ultimately took only five months.

¶ 27    Respondent was the company's sole owner, and the company's profits were included in his personal income tax return. Respondent listed his income as $0 on his March 29, 2019, financial affidavit because he did not know what his income would be. The same affidavit listed a gross income of $188,457 for 2018, but that also should have been $0 because he was not done with his tax return at the time and did not know what his income would be. He later determined that he earned around $400,000 in 2018. That year, SeaHarbor had almost $7 million in gross revenue. Its expenses included $13,345 in deductible meals and $80,311 in travel. SeaHarbor purchased a Porsche Cayman for respondent in April 2019 for $55,000; respondent's 2019 financial affidavit listed a 2007 Cadillac worth $2,216. Respondent's household also had a Range Rover that SeaHarbor purchased in July 2018 for $65,000, which was not reflected in any of the financial affidavits.

¶ 28    Between January 2017 and the date of the hearing, respondent had taken numerous trips, both within the United States and internationally, spending many tens of thousands of dollars. Most of the trips were business trips, but he also took family trips, including one in 2019 for which

he spent about $10,000 on a vacation rental. In October 2018, his wife came with him to a business conference in Florida, and she spent about $8,000 on clothing while they were there. She spent another $5,400 on clothing during a trip to Las Vegas in November 2018. Respondent's wife worked full-time for SeaHarbor, but she was not an employee. Respondent compensated her for her work by "let[ting] her go shopping and tak[ing] her out to dinner"; the dinners were not part of the meals included as business expenses. Respondent was a member of a country club, and between December 31, 2016, and February 1, 2019, he made payments to the club totaling $47,224.87.

¶ 29     The trial court issued a memorandum order on September 9, 2019, stating as follows, in relevant part. There was extensive testimony and argument as to what portion of SeaHarbor's revenue should be considered income to respondent. Respondent's most recent financial affidavit of March 29, 2019, was illustrative of the problems that petitioner and the trial court had in making this determination. The affidavit did not list a gross income amount. Respondent testified that his income was not "necessarily zero" and referred to his 2018 tax return as a guide, yet he was able to calculate his monthly expenditures with specificity. He initially reported his 2018 gross income as $188,457, which he later amended to $400,000. At a time he claimed to be relying on liquidated retirement assets and loans to pay living expenses, his company actually covered many of his personal expenses, including paying cash for two luxury vehicles. Neither expenditure was reported on his financial affidavits. Other questionable expenditures that could be attributed as unreported income included several luxury family vacations, lavish spending sprees at high-end clothing stores, and expensive dining experiences, none of which were reported on his financial affidavits. It did not appear that respondent's loss of employment impacted his lifestyle in any significant way, including his maintenance of an expensive country club membership.

¶ 30    The trial court continued that respondent's failure to openly report these expenditures led the trial court to question his overall credibility. This credibility was further strained when he testified that the spending sprees, vacations, and dining were not properly considered income to him but were rather compensation to his current wife for her unpaid contributions to the business. Respondent's testimony was also not credible regarding the reconciliation of his bank statements to the income numbers reported on the financial affidavits. His explanation of his business income and expenses was often unnecessarily complex, and the unrebutted testimony about his lifestyle was at odds with his claim of $0 or negligible income. Petitioner's testimony and evidence was more credible and persuasive than respondent's testimony and evidence. The trial court accepted respondent's testimony about the costs of his health and dental insurance.

¶ 31    Based on these considerations, it was almost impossible for the trial court to determine respondent's income for the purpose of allocating responsibility for contribution to college expenses. It therefore accepted his representation that his 2018 income was $400,000, and it imputed an additional $150,000 in gross annual income to him based on his lifestyle, spending patterns, and business income, projections, and revenue. The trial court granted petitioner's motion to modify college contributions and ordered that respondent pay 71% of the parental obligations for college and that petitioner pay 29%.

¶ 32    On September 18, 2019, petitioner filed a motion for sanctions under section 501 of the Dissolution Act, arguing that all of respondent's sworn financial affidavits were either intentionally or recklessly inaccurate and misleading. Respondent then obtained counsel.

¶ 33    The trial court held a hearing on petitioner's motion for attorney fees and sanctions on October 22, 2019. It found under section 508(b) that respondent had needlessly increased the cost of litigation by virtue of his conduct in the case; we summarize its findings. It routinely dealt with

cases involving people who owned their own business, but this case went on and on. Respondent chose to represent himself *pro se*, and it seemed like he wanted to drag the case out so that petitioner would run out of money and give up. The pleadings in the case showed that there were many discovery problems, and the trial court agreed with petitioner's counsel that the case should have been resolved much sooner than it was. Petitioner's attorney fees were reasonable and necessary. She requested $80,000 in attorney fees, but it would award her $50,000. Additionally, it sanctioned respondent $15,000.

¶ 34    Respondent timely appealed.

¶ 35                                II. ANALYSIS

¶ 36    We begin by addressing petitioner's argument that we should strike respondent's brief and dismiss his appeal for failing to cite the record in his statement of facts and stating conclusions without supporting facts. We disagree with petitioner's assertion that respondent's statement of facts is conclusory. We agree that he fails to cite to the record, contrary to Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018), but this oversight does not warrant striking his brief or dismissing his appeal. Rather, we remind counsel to comply with supreme court rules regarding the requirements of briefs.

¶ 37    Turning to the merits, respondent first argues that the trial court erred in granting petitioner attorney fees under section 508(b). Section 508(b) provides in relevant part:

> "If at any time a court finds that a hearing under this Act was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 2018).

A trial court may impose fees under section 508(b) without considering the parties' ability to pay. *In re Marriage of Davis*, 2019 IL App (3d) 170389, ¶ 22. We will not disturb a trial court's decision to award or deny attorney fees absent an abuse of discretion. *Id.* Fees awarded under section 508(b) are subject to a reasonableness determination based on factors such as time spent, the attorney's ability, and the complexity of the work. *In re Marriage of Walters*, 238 Ill. App. 3d 1086, 1098 (1992). The determination of reasonable attorney fees is also within the trial court's sound discretion. *Joiner v. SVM Management, LLC*, 2020 IL 124671, ¶ 52. A trial court abuses its discretion only where its ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the trial court's view. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 38    Respondent points out that in the petition for 508(b) attorney fees, petitioner listed eight pleadings as the basis for her claim that respondent unnecessarily increased litigation costs. See *supra* ¶ 22. He asserts that none of those pleadings support such a finding. He argues that for the first pleading, petitioner sought to strike his request to modify child support based on his job loss, but the trial court eventually granted him the relief he sought, in part. Respondent notes that the second pleading, for indirect civil contempt, was never litigated. Regarding the third pleading, which was to continue the hearing on the parties' cross-motions for college contribution, respondent points out that the primary basis for the continuance was petitioner's attorney's conflict with the hearing date. Respondent highlights that the fourth pleading was brought against a third-party bank over which he had no control. The fifth and sixth pleadings resulted in respondent's subpoenas against Workman being quashed, but respondent argues that there was no evidence of a harassing intent, as the trial court granted him leave to re-issue the first subpoena, and it denied petitioner's requests for supervised discovery. For the seventh pleading, which was labeled as an emergency motion, respondent argues that the trial court found that it did not constitute an

emergency. Respondent argues that the last pleading, a motion to compel discovery, was not the result of harassing behavior, as it was resolved by an agreed order that also required petitioner to produce additional discovery documents. Respondent argues that, therefore, none of the eight pleadings that petitioner identified showed that he unnecessarily increased the cost of litigation, such that she fell drastically short of her burden of proving that section 508(b) fees were appropriate.

¶ 39    At the hearing on the petition, petitioner argued that the case could have been resolved much sooner if respondent had "filed a truthful affidavit." Counsel also mentioned that the purchases of the Porsche and Range Rover were not disclosed. Respondent contends that this argument was simply another attempt to mischaracterize the evidence. He argues that the cars were not listed in his financial affidavit because they were purchased by SeaHarbor and titled in its name, such that they were not his assets to disclose, and that the Porsche was not even purchased until after his March 29, 2019, financial affidavit.

¶ 40    Respondent additionally argues that the trial court arbitrarily awarded petitioner $50,000 in attorney fees, because it did not make the requisite findings to provide a nexus between its fee award and his alleged misconduct. Respondent cites *In re Marriage of Walters*, 238 Ill. App. 3d 1086, 1098 (1992), where the court stated that section 508(b) fees are subject to a determination of reasonableness. Respondent argues that under section 508(b), the trial court was required to identify what court proceedings and corresponding billing entries it deems to have been caused by a party's improper actions, and the amount of fees the other party incurred as a result of those actions. Respondent maintains that the trial court's cursory finding that the fees incurred were "reasonable and necessary," without any further explanation, did not fulfill the statute's requirements.

¶ 41    In response, petitioner points to the trial court's finding that respondent unnecessarily increased the cost of litigation by virtue of his conduct throughout the case. Petitioner argues that the record supports the trial court's finding, as she expended a great deal of attorney fees in uncovering respondent's numerous misrepresentations about his finances, which were clearly aimed to induce her and the trial court to enter an order that did not comport with his economic reality. Petitioner argues that she had to issue subpoenas directly to a number of entities to uncover respondent's true income and resources, which he should have willingly produced, such as his personal bank account and that of SeaHarbor, which he owned and controlled. Petitioner argues that even then, respondent attempted to obstruct her by filing motions to quash, which were summarily denied. Petitioner maintains that respondent also continued to file financial affidavits with false and/or misleading information.

¶ 42    Petitioner argues that respondent improperly relies on an individual analysis of the eight pleadings referenced in her petition and takes the litigation surrounding the pleadings out of context. She maintains that the trial court made clear that its decision was based on a number of factors, including the pleadings and arguments of counsel. According to petitioner, the most relevant consideration was respondent's propensity to mislead her and the trial court throughout the proceedings regarding his income, protracting the litigation and needlessly causing her to incur substantial attorney fees and costs. She argues that the trial court also referenced a review of her counsel's billing statements in its decision.

¶ 43    We conclude that the trial court did not abuse its discretion in ruling that respondent caused a hearing or hearings to be precipitated or conducted for any improper purpose, such as harassment, unnecessary delay, or other acts unnecessarily increasing the cost of litigation. See 750 ILCS 5/508(b) (West 2018). The record clearly supports a determination that respondent

repeatedly attempted to obfuscate his income and financial resources. For example, respondent testified that he began conceptualizing SeaHarbor in 2015, started forming a business plan in late 2016, and applied for a business loan in March 2017. Respondent predicted that the company would have $5.4 million of gross income in its first 12 months of operation; $12.6 million in its second year, with profits of $587,651; and about $20.4 million in its third year, with profits of $3,047,387. However, in respondent's March 21, 2017, answer to petitioner's motion to modify college contributions, he explicitly denied the allegation that he was self-employed at a time that SeaHarbor had already applied for or was about to apply for a loan. Respondent testified that SeaHarbor's loan was approved in September 2017, but he did not reveal the company's existence to petitioner until his deposition on October 6, 2017. Moreover, even though respondent testified that SeaHarbor's profits were included in his personal tax return, he argued in his November 10, 2017, motion to quash the subpoena against Signature Bank that communication between the bank and SeaHarbor was "entirely unrelated and irrelevant to the instant proceedings." Glaringly, respondent's January 2, 2018, August 31, 2018, March 29, 2019, financial affidavits listed his gross monthly income as $0, contrary to his access to money and his own profit projections. The affidavits also did not show the tens of thousands of dollars flowing in and out of his accounts, as later demonstrated by financial statements.

¶ 44    That being said, we agree with respondent that the trial court arbitrarily awarded petitioner $50,000 in attorney fees with no apparent connection between those fees and the hearings respondent "precipitated or conducted for any improper purpose ***." 750 ILCS 5/508(b) (West 2018). See *In re Marriage of Anderson & Murphy*, 405 Ill. App. 3d 1129, 1138 (2010) (trial court found attorney fees reasonable but awarded party "an arbitrary sum" of $25,000); *In re Marriage of Gattone*, 317 Ill. App. 3d 346, 360 (2000) (it was improper for the trial court to award attorney

fees for the dissolution proceeding in general under section 508(b)). Such findings were particularly necessary in this case because several of the pleadings that petitioner identified in her petition for section 508(b) fees cannot be said to have led to hearings based on respondent's improper conduct. See *Howle v. Aqua Illinois, Inc.*, 2012 IL App (4th) 120207, ¶ 34 (pleadings serve to present, define, and narrow the issues and limit the proof needed at trial). For example, as respondent points out, respondent was ultimately granted relief on his request to modify child support due to his job loss, with the trial court finding that he had overpaid child support by $5,142.71. Another example is petitioner's March 19, 2018, petition for indirect civil contempt against Signature Bank, which was a third party over which respondent had no control. Accordingly, we remand the cause for the trial court to specify which hearings and related attorney fees were due to respondent's improper conduct. We express no opinion as to what constitutes an appropriate amount of fees.

¶ 45    Respondent next argues that the trial court erred in sanctioning him $15,000 under section 501 for "perceived errors" in his financial affidavits. Section 501 states, in relevant part, "If a party intentionally or recklessly files an inaccurate or misleading financial affidavit, the court shall impose significant penalties and sanctions including, but not limited to, costs and attorney's fees." 750 ILCS 5/501(a)(1) (West 2018). We will reverse a trial court's sanction only where the record establishes a clear abuse of discretion. See *Zemater v. Village of Waterman*, 2020 IL App (2d) 190013, ¶ 26.

¶ 46    Respondent argues that the trial court abused its discretion in sanctioning him, because his financial affidavits were corroborated and elaborated upon with his testimony and other evidence introduced at trial. He maintains that the trial court's September 9, 2019, order focused on his March 29, 2019, affidavit, and he addresses several findings. First, the trial court highlighted that

respondent did not list a gross monthly income and listed his 2018 income as $188,146. Respondent argues that his testimony clarified that he did not list a monthly income because he had not yet filed his 2018 tax return. He points out that he testified that he finished his tax return on April 19, 2019, that he mailed it to petitioner's attorney within a few hours of filing it, and that his income was $400,000. Respondent maintains that $188,146 was his gross income for 2017, and that he used that amount until he determined his 2018 income. Respondent asserts that his actions were not those of someone trying to mislead the other party or the trial court, but rather he was "simply trying not to give inaccurate information."

¶ 47     The trial court further stated that respondent had not disclosed the purchase of two luxury vehicles and that he had large expenditures for travel, dining, and shopping. Respondent again argues that the cars belonged to SeaHarbor rather than to him, and that the second vehicle was not even purchased until after he filed his March 29, 2019, financial affidavit. Respondent contends that the other expenditures were disclosed through his bank and credit card statements and that he testified truthfully and extensively about them, including that many of the trips identified by petitioner as vacations were actually business trips. He argues that his 2018 tax return was the best evidence of his income for that year, which the trial court accepted, and that the tax return also clarified any concerns regarding alleged discrepancies between his financial affidavits and bank statements.

¶ 48     Petitioner argues that the financial affidavits were particularly relevant in the instant proceedings because the trial court needed to determine each party's financial obligations for college contributions. She notes that respondent filed four financial affidavits during the relevant time period: one in 2017, two in 2018, and one in 2019. Petitioner argues that even by respondent's own testimony, the affidavits were false and misleading, in that each of them listed a current

monthly income and year-to-date income as $0. She argues that he further purposefully omitted assets by failing to disclose his interest in SeaHarbor in the 2017 affidavit and his interest in the two luxury vehicles, and by underreporting his bank balances. Petitioner maintains that respondent admitted at trial that SeaHarbor paid a number of personal expenses for him and his wife, including luxury vacations and dining at high-end restaurants. She also highlights that even with respondent's job loss, he continuously maintained his country club membership. Petitioner argues that respondent's false representations in his financial affidavits was intentional, or at a minimum, clearly reckless, such that the trial court properly imposed a $15,000 sanction.

¶ 49    We initially note that section 501 relates to temporary relief. See 750 ILCS 5/501 (West 2018). However, respondent has not argued that the section is inapplicable for that reason, so we do not address that issue. We agree with petitioner that the trial court acted within its discretion in sanctioning respondent $15,000. The main fault with respondent's arguments is that he focuses on his actions and testimony *after* he filed his last financial affidavit. The trial court's sanction, however, was for the affidavits themselves, which portrayed a very distorted view of respondent's financial resources. Looking at respondent's March 29, 2019, affidavit, for example, he listed his gross monthly income and gross year-to-date income as $0, without any further explanation, and despite the fact that he had already calculated SeaHarbor's anticipated profits when seeking a bank loan. Based on the $0 income, respondent listed his total income available per month as -$19,510.73. His lifestyle was completely at odds with this representation, as he and his spouse engaged in luxurious trips, dining, and shopping. Many of these expenses were technically paid by SeaHarbor, but respondent personally paid for many significant expenses as well, including continuously maintaining his country club membership. Moreover, respondent wholly owned and controlled SeaHarbor, such that he determined the company's expenditures. The company's profits

were included in respondent's personal income tax return, so respondent's choices regarding company expenses directly impacted the company's profits and thus respondent's own income. In other words, every dollar that SeaHarbor spent in expenses presumably decreased respondent's personal income to some extent, while respondent personally benefitted from many of the expenses such as luxury travel and dining. Also, even setting aside the purchase of the Porsche, SeaHarbor purchased a Range Rover in 2018 for respondent's household use, which was not reflected in any of respondent's financial affidavits. The parties' respective financial statuses were the central issue in the dispute about college contributions, and we agree with petitioner that respondent appears to have either intentionally or recklessly mispresented his financial circumstances in his financial affidavits. Accordingly, the trial court did not abuse its discretion in sanctioning respondent $15,000 for these misrepresentations.

¶ 50                                    III. CONCLUSION

¶ 51    For the reasons stated, we affirm the circuit court of Du Page County's rulings sanctioning respondent $15,000 under section 501 of the Dissolution Act and finding that respondent needlessly increased the costs of litigation under section 508(b) of the Dissolution Act. However, we reverse its award of $50,000 in attorney fees under section 508(b) and remand for further proceedings consistent with this order.

¶ 52    Affirmed in part and reversed in part. Cause remanded.